RAGGI, Circuit Judge.
Plaintiff-Appellant Allen Dotson, formerly a United States probation officer in the Southern District of New York, sued District Judges Thomas P. Griesa and Kevin T. Duffy, the Southern District Probation Office, Chief Probation Officer Chris J. Stanton, and Southern District Executive Clifford P. Kirsch, pursuant to 42 U.S.C. § 1981 and Bivens v. Six Unknown, Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), for alleged race discrimination and denial of due process in connection with his termination. He now appeals pro se from a judgment of dismissal entered by the United States District Court for the Southern District of New York (Richard Conway Casey, Judge) on March 29, 2001. See Fed.R.Civ.P. 12(b)(6).
A liberal reading of Dotson’s pro se appellate brief suggests that he raises the following challenges to the judgment of dismissal: (1) the district court should not have ruled on the dismissal motion without hearing oral argument, (2) the court erred in granting dismissal without affording Dotson discovery, (3) the court failed to recognize the merits of Dotson’s discrimination and due process claims, (4) the court erred in ruling that Dotson could not sue the named defendants pursuant to § 1981, and (5) the court erred in ruling that Dotson’s Bivens claim for money damages and his equitable action for reinstatement were precluded by the Civil Service Reform Act of 1978 (“CSRA”), Pub.L. No. 95-454, 92 Stat. 1111 et seq. (codified, as amended, in various sections of Title 5, United States Code (1982 ed. and Supp. IV)).
The first three points may be disposed of without discussion. First, a district court acts well within its discretion in deciding dispositive motions on the parties’ written submissions without oral argument. See generally AD/SAT v. Associated Press, 181 F.3d 216, 226 (2d Cir.1999). Second, a plaintiff is not entitled to discovery if his pleadings are fatally and incurably defective as a matter of law. See, e.g., M.B. # 11072-054 v. Reish, 119 F.3d 230, 232 (2d Cir.1997) (per curiam); Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983). Third, contrary to Dotson’s argument, the district court’s ruling assumes the truth of all allegations pleaded in Dotson’s complaint. In any event, where pleadings are legally defective, dismissal is warranted without regard to the factual merits of a plaintiffs underlying claim. See, e.g., Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).
*160 Dotson’s final two points are the focus of this opinion. For the reasons stated herein, we conclude that his § 1981 claim is legally defective because that statute applies only to persons acting under color of state, not federal, law. We further conclude that Dotson cannot maintain a Bivens action for money damages against the named individuals or sue for equitable reinstatement. On this issue; the court requested and has received a thoughtful ami-cus filing supporting Dotson’s position. Amicus argues that (1) Dotson may sue defendants in federal court for depriving him of various procedural protections afforded’ by the CSRA in connection with his termination; and (2) in any event, the CSRA does not preclude Dotson from maintaining a Bivens action for money damages or from suing for equitable relief. We cannot agree. The CSRA represents Congress’s comprehensive identification of the employment rights and remedies available to federal civil service personnel. Although Dotson is .covered by various provisions of this Act, the statute excludes him, and most other employees of the judicial branch, from its administrative and judicial review procedures. Thus, he cannot sue for deprivation, of CSRA procedures. Nor can he sue for damages under Bivens or for equitable relief. Precisely because the CSRA reflects a detailed and comprehensive system for dealing with federal employment concerns, federal courts will generally not attempt to supplement the relief afforded by that statute through other actions, including those implied under Bivens or derived from equity. See United States v. Fausto, 484 U.S. 439, 448-49, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988) (rejecting federal employee’s attempt to obtain relief not afforded by CSRA through Court of Claims action); see also Schweiker v. Chilicky, 487 U.S. 412, 421, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988) (holding that “[t]he absence of statutory relief for a constitutional violation” does not necessarily imply the availability of a Bivens action).
We proceed cautiously in reaching this conclusion, mindful that it may appear, at first glance, to exempt the judiciary from any judicial review of its own employment actions, even with respect to charges of discrimination. In fact, neither Congress’s actions nor this court’s ruling yields that result.[1] The structure and history of the CSRA certainly indicate that Congress’s exclusion of most judicial branch employees from that statute’s review procedures was not inadvertent but deliberate. Moreover, the exclusion has been maintained through various amendment cycles. Nevertheless, Congress’s choice appears to have been informed in no small part by the existence of the judiciary’s own administrative review procedures for employment disputes, which, in many respects, mirror those afforded in the CSRA. Notably, the judiciary’s administrative procedures with respect to claims of discrimination in employment have always included review by a *161 judicial officer. See infra at 172-77. In short, in withholding CSRA review rights from judicial branch employees, Congress has acted with an awareness that the judiciary has itself provided for its employees what can only be afforded private employees or employees of other branches of government through legislation: a measure of judicial review for claims of employment discrimination. We conclude that these circumstances qualify as “special factors,” precluding Dotson from invoking Bivens to sue for money damages or from seeking equitable relief. Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. at 396-97, 91 S.Ct. 1999; accord Schweiker v. Chilicky, 487 U.S. at 421-22, 108 S.Ct. 2460. Accordingly, the district court’s judgment of dismissal is affirmed.

Background

Allen Dotson is an African-American male who was employed by the Southern District Probation Department for approximately ten years when he and a fellow officer were terminated for purportedly misrepresenting their on-duty whereabouts and activities on November 21, 1997. According to his complaint, Dotson was initially notified of his termination in a December 8, 1997 letter from Chief Probation Officer Stanton, which was also signed by Judge Duffy, then Chairman of the Probation and Criminal Law Committee of the United States District Court for the Southern District of New York.
Dotson protested the termination and sought reinstatement. Pursuant to an administrative plan then in effect in the Southern District of New York for review of employment disputes involving probation officers, then Chief Judge Griesa referred Dotson’s protest to District Executive Kirsch for a hearing.[2] At the hearing, which was conducted on February 19, 1998, Dotson was represented by counsel, but he complains that Kirsch refused to allow his attorney to call witnesses who could have verified Dotson’s presence in the field on November 21, 1997. He further asserts that Kirsch ignored documentary evidence similarly proving his whereabouts.
On April 21, 1998, Kirsch submitted a written report to Judge Griesa, recommending that Dotson’s termination be upheld and that his request for reinstatement be denied. On the same date, Judge Grie-sa approved Kirsch’s report. On July 2, *162 1998, Dotson requested reconsideration, for the first time suggesting that he wished to show that race discrimination influenced employment decisions in the Southern District Probation Office. Judge Griesa denied reconsideration in an order filed October 14, 1998, stating, “I have given this request the most careful consideration. I conclude that the prior proceedings in our Court have been thorough and fair and that the termination of Allen Dotson ... was justified on the basis of the evidence and was an action which was necessary in the interests of the proper conduct of the Probation Department.”
On December 1, 1999, Dotson filed the instant action. In his complaint, he states that he engaged in no cover-up of his whereabouts on November 21, 1997, and that he is guilty, at most, of a minor error in his field report, a result of his superiors requiring him to prepare his field report without his notes. Dotson submits that his termination evidences race discrimination by each named defendant because white probation officers who submitted false field reports were not dismissed. Further, in cases where white probation officers were terminated, Dotson asserts that they were afforded process that was denied him, specifically, a hearing before the court.

Discussion

I. Standard of Review
This court reviews the dismissal of a complaint under Rule 12(b) de novo, taking as true the material facts alleged in the complaint and drawing all reasonable inferences in favor of the plaintiff. See Desiano v. Warner-Lambert Co., 326 F.3d 339, 347 (2d Cir.2003).
II. Dotson’s § 1981 Claim Fails Because Defendants Were Acting Under Color of Federal Law
Title 42 United States Code § 1981(a) states: “All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens.” A 1991 amendment to §'1981 clarifies that “[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and" impairment under color of State law ” (emphasis added). 42 U.S.C. § 1981(e).
This court has long construed the phrase “under color of state law” as used in related civil rights statutes, notably 42 U.S.C. § 1983, to apply only to state actors, not federal officials. See Kingsley v. Bureau of Prisons, 937 F.2d 26, 30 n. 4 (2d Cir.1991) (holding that “[a]n action brought pursuant to 42 U.S.C. § 1983 cannot lie against federal officers”); Yalkut v. Gemignani, 873 F.2d 31, 35 (2d Cir.1989). Today, we hold that this construction also applies to the same language in § 1981. See Lee v. Hughes, 145 F.3d 1272, 1277 (11th Cir.1998) (affirming dismissal of § 1981 claim by terminated U.S. probation officer: “Both circuit precedent and the text of § 1981 compel us to hold that a plaintiff cannot maintain a § 1981 claim against a federal defendant acting under color of federal law.”); see also Davis-Warren Auctioneers, J.V. v. Fed. Deposit Ins. Corp., 215 F.3d 1159, 1161 (10th Cir.2000) (affirming dismissal of § 1981 claim against federal agency); Davis v. United States Dep't. of Justice, 204 F.3d 723, 725 (7th Cir.2000) (same).
In this case, it is undisputed that all complained-of actions by the named defendants were conducted pursuant to their authority under federal, not state, law. Thus, because Dotson cannot satisfy the “under color of state law” requirement of a § 1981 claim, we affirm the district court’s dismissal of this part of his complaint.
*163 III. Dotson May Not Sue Defendants for Employment Discrimination Under the CSRA, nor Is Such a Claim In-ferrable Under Bivens
Dotson and amicus assert that he may sue defendants for employment discrimination because either (1) the CSRA affords him a right to judicial review; or (2) if the CSRA does not afford such review, a cause of action should be inferred from the Constitution itself pursuant to Bivens. Neither argument is convincing.
A. The Administrative and Judicial Review Procedures of the CSRA Do Not Apply to Judiciary Employees such as Dotson
The CSRA, enacted in 1978, “comprehensively overhauled the civil service system,” replacing a patchwork of rules and regulations with a “new framework for evaluating adverse personnel actions against [federal employees].” Lindahl v. Office of Pers. Mgmt., 470 U.S. 768, 773-74, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985). “[T]o balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration,” the CSRA creates “an integrated scheme of administrative and judicial review” for adverse employment actions. United States v. Fausto, 484 U.S. at 445, 108 S.Ct. 668. That scheme, however, affords no administrative or judicial review to judicial branch employees such as Dotson.
The detailed protections and remedies afforded federal civil servants by the CSRA do not apply uniformly to all covered employees. Rather, they depend upon an employee’s classification within the Act. The CSRA divides civil service personnel into three main classifications: the senior executive service, the competitive service, and the excepted service. The “senior executive service” consists of employees who occupy high-level positions in the executive branch, but for whom nomination by the President and confirmation by the Senate is not required by law. See 5 U.S.C. § 3132(a)(2). The “competitive service” consists of employees who are (a) in the executive branch, except for those in the senior executive service or specifically excepted by statute, see id. § 2102(a)(1); or (b) not in the executive branch, but included in the competitive service by statute, see id. § 2102(a)(2). The “excepted service” consists of employees who are not included in the definitions of either the senior executive service or the competitive service. See id. § 2103(a). As these definitions indicate, employees of the judicial branch, including probation officers such as Dotson, see 18 U.S.C. § 3602, qualify as excepted service personnel because they are neither in the executive branch nor included in the competitive service by statute.
Within each of the three employment classifications, the CSRA accords preferential treatment to certain veterans and their close relatives. See 5 U.S.C. § 2108. Because Dotson is not a veteran, these preferences do not apply to him. Accordingly, he is properly viewed as a non-preference-eligible member of the excepted service.
Three sections of the CSRA, Chapters 23, 43, and 75, afford detailed procedural protections to civil service employees who experience adverse employment actions. None, however, applies to non-preference-eligible excepted service employees of the judicial branch such as Dotson.
Chapter 23 “establishes the principles of the merit system of employment,” United States v. Fausto, 484 U.S. at 446, 108 S.Ct. 668 (citing 5 U.S.C. § 2301), expressly prohibiting certain personnel practices, including race discrimination, see 5 U.S.C. § 2302. Amicus argues that Chapter 23 *164 covers all civil service employees, entitling Dotson to the procedures and protections afforded in this section of the CSRA. We must disagree. Although Chapter 23 does apply to non-preference-eligible excepted service employees, its prohibitions protect only “employee[s] in, or applicants] for, a covered position in an agency.” Id. § 2302(a)(2)(A) (emphasis added). The chapter defines “agency” to include only “Executive agencies]” and the Government Printing Office. Id. § 2302(a)(2)(C); see also id. § 105 (stating that for purposes of Title 5, “ ‘Executive agency’ means an Executive department, a Government corporation, and an independent establishment”). Because Dotson was an employee of the judicial branch, not a federal agency, see United States v. Reyes, 283 F.3d 446, 455 (2d Cir.2002) (recognizing United States Probation Department as part of the judicial branch because Congress established it as an arm of the district court), Chapter 23 affords him no relief, see generally O’Brien v. Office of Indep. Counsel, 74 M.S.P.R. 192, 199 (M.S.P.B.1997) (“Executive agencies do not include entities of the legislative or judicial branches of the Federal government.”).[3]
Chapter 43 “governs personnel actions based on unacceptable job performance.” United States v. Fausto, 484 U.S. at 445, 108 S.Ct. 668. It provides employees who face removal or a reduction in grade with a number of procedural protections, including 30 days’ advance written notice of the proposed action; the right to respond to the charges and the right to be represented by counsel; a written administrative decision specifying the instances of unacceptable performance; and, in certain cases, a right to appeal an adverse decision to the Merit Systems Protection Board and then to the Federal Circuit. See id. at 446, 108 S.Ct. 668 (citing 5 U.S.C. § 4303(b)(1), (e)). Although Chapter 43 applies generally to both the competitive and excepted services, its definitions indicate that its procedural protections apply only to employees of the executive branch falling into these two categories. Title 5 U.S.C. § 4303 provides these protections to “employees”; § 4301(2) defines “employee” as “an individual employed in or under an agency”; and § 4301(1) defines “agency” as an “Executive agency” or the Government Printing Office. Thus, like Chapter 23, Chapter 43 does not apply to judicial branch employees such as Dotson.
Chapter 75 accords procedural protections akin to those provided under Chapter 43 to employees who face adverse personnel action for the “efficiency of the service.” United States v. Fausto, 484 U.S. at 446, 108 S.Ct. 668 (citing 5 U.S.C. §§ 7501-04, 7511-14). Section 7511(a)(1) defines “employee” as follows:
(A) an individual in the competitive service- — •
(i) who is not serving a probationary or trial period under an initial appointment; or
(ii) who has completed 1 year of current continuous service under other *165 than a temporary appointment limited to 1 year or less;
(B) a preference eligible in the excepted service who has completed 1 year of current continuous service in the same or similar positions—
(i) in an Executive agency; or
(ii) in the United States Postal Service or Postal Rate Commission; and
(C) an individual in the excepted service (other than a preference eligible)—
(i) who is not serving a probationary or trial period under an initial appointment pending conversion to the competitive service; or
(ii) who has completed 2 years of current continuous service in the same or similar positions in an Executive agency under other than a temporary appointment limited to 2 years or less.
5 U.S.C. § 7511.
Dotson contends that he qualifies for Chapter 75 protection under § 7511(a)(l)(C)(i) because his non-preference eligible excepted service employment was not probationary. Dotson misconstrues the statute. Section 7511(a)(l)(C)(i) does not define “employee” expansively to include all non-preference eligible excepted service personnel other than those “serving a probationary or trial period.” Rather, to qualify as an employee pursuant to subsection (C)(i), a person must hold, on a non-probationary basis, a position in the excepted service that is pending conversion to the competitive service. This construction comports with rulings by the Federal Circuit, the court charged with reviewing Chapter 75 challenges. See Hartman v. Merit Sys. Prot. Bd., 77 F.3d 1378, 1379 (Fed.Cir.1996) (“Section 7511(a)(1) defines ‘employee’ in relevant part as ... an individual in the ‘excepted service’ who either is awaiting conversion to the competitive service and is not serving a probationary period, or has completed two years of current continuous service in an Executive agency.” (emphasis added)); see also Van Wersch v. Dep’t of Health & Human Servs., 197 F.3d 1144, 1150 & n. 6 (Fed.Cir.1999) (noting that § 7511(a)(1)(C)(i) was added in the Senate for the express purpose of limiting the appeal rights of certain special appointments that would be converted to the competitive service while those employees were on probationary appointments). Because the position of probation officer is not within the competitive service and because Dotson did not serve two years of current continuous service in an executive agency, § 7511(a)(1)(C) affords him no procedural rights.
In sum, while the CSRA meticulously categorizes the thousands of federal civil service employees into three categories and provides a detailed and comprehensive means for addressing their employment grievances,- it provides no administrative or judicial review rights for non-preference eligible excepted service personnel serving in the judicial branch such as Dotson.
B. The CSRA Precludes Dotson from Maintaining a Bivens Damages Claim for Employment Discrimination
Dotson and amicus submit that if the CSRA affords him no administrative or judicial review rights to challenge discrimination in his termination, this court should imply a cause of action for money damages against the individual defendants under Bivens. We decline this invitation.
1. Prudential Factors Limiting Bivens Actions
In Bivens, the Supreme Court recognized as implicit in the rights guaranteed *166 by the Fourth Amendment a cause of action for money damages against federal officials, sued in their individual capacities, who had allegedly violated those rights. See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. at 396-97, 91 S.Ct. 1999. Bivens actions have subsequently been recognized to vindicate rights protected by the Eighth Amendment, see Carlson v. Green, 446 U.S. 14, 19-23, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (recognizing Bivens action against federal official who allegedly subjected plaintiff to cruel and unusual punishment), and the Due Process Clause, see Davis v. Passman, 442 U.S. 228, 244-49, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (recognizing Bivens action against member of Congress for alleged gender discrimination).
Because a Bivens action is a judicially created remedy, however, courts proceed cautiously in extending such implied relief, particularly if either of two factors (absent from Bivens) are present in a case, specifically: (a) an “explicit congressional declaration that persons injured by a federal officer’s violation of [a constitutional] Amendment may not recover money damages from the agents but must instead be remitted to another remedy equally effective in the view of Congress,” or (b) “special factors counseling hesitation in the absence of affirmative action by Congress.” Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. at 396-97, 91 S.Ct. 1999; see Schweiker v. Chilicky, 487 U.S. at 421-22, 108 S.Ct. 2460.
2. The CSRA Remedial Scheme as a “Special Factor” Precluding Bivens Claims to Challenge Federal Employment Actions
The enactment and amendment of the CSRA to construct an “elaborate remedial scheme” for dealing with federal employment issues has been identified by the Supreme Court as a special factor cautioning against recognition of an implied right of action for federal employment disputes. Bush v. Lucas, 462 U.S. 367, 388, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). In Bush, the Court refused to allow a federal aerospace engineer alleging retaliatory demotion to sue for money damages under Bivens, although recognizing that the ruling might leave plaintiff without “complete relief’ for his alleged injury. Id., As the Court explained, the question of preclusion did not turn on “the merits of the particular remedy” sought but on “who should decide” what remedy, if any, should be provided. Id. at 380, 103 S.Ct. 2404. The Court concluded that the decision belonged to Congress, not the judiciary: “Congress is in a far better position than a court to evaluate the impact of a new species of litigation between federal employees on the efficiency of the civil service.” Id. at 389, 103 S.Ct. 2404.
Because the CSRA did afford the employee in Bush v. Lucas other relief for his injuries, some courts initially concluded that preclusion depended on the statute providing the particular employee with meaningful remedies for his employment claim. See, e.g., McIntosh v. Weinberger, 810 F.2d 1411, 1434-36 (8th Cir.1987), vacated sub nom. Turner v. McIntosh, 487 U.S. 1212, 108 S.Ct. 2861, 101 L.Ed.2d 898 (1988); Kotarski v. Cooper, 799 F.2d 1342, 1348-49 (9th Cir.1986), vacated 487 U.S. 1212, 108 S.Ct. 2861, 101 L.Ed.2d 897 (1988). This assumption was dispelled by the ruling in Schweiker v. Chilicky. In rejecting a Bivens claim by Social Security recipients seeking money damages for due process violations in connection with their continuing disability reviews, Chilicky made clear that it is the overall comprehensiveness of the statutory *167 scheme at issue, not the adequacy of the particular remedies afforded, that counsels judicial caution in implying Bivens actions. The Court emphasized that “[t]he absence of statutory relief for a constitutional violation” is not sufficient, by itself, for courts to imply a cause of action for money damages against the official causing the violation. Schweiker v. Chilicky, 487 U.S. at 421-22, 108 S.Ct. 2460. It explained that “the concept of ‘special factors counseling hesitation in the absence of affirmative action by Congress’ has proved to include an appropriate judicial deference to indications that congressional inaction [in providing a statutory remedy in a particular circumstance] has not been inadvertent.” Id. at 423, 108 S.Ct. 2460 (quoting Bivens; 403 U.S. at 396-97, 91 S.Ct. 1999).
The unavailability of judicial review under the CSRA for certain employment grievances cannot be deemed “inadvertent” in light of the Supreme Court’s decision in United States v. Fausto. Fausto, an employee of the Department of the Interior, had no right to administrative or judicial review of a disciplinary suspension under Subehapter II, governing “major adverse employment actions,” in the then-version of CSRA Chapter 75. When he attempted to challenge the employment action in the Court of Claims by suing under the Back Pay Act, 5 U.S.C. § 5596, and the Tucker Act, 28 U.S.C. § 1491, the Supreme Court ruled the suit precluded by the CSRA, noting that the unavailability of judicial review in Fausto’s case was “not an uninformative consequence of the limited scope of the [CSRA], but rather manifestation of a considered congressional judgment that [in certain contexts, certain federal employees] should not have statutory entitlement to review for adverse action of the type governed by Chapter 75.” United States v. Fausto, 484 U.S. at 448-49, 108 S.Ct. 668.
At the time Fausto was decided, § 7511 of the CSRA defined the term “employee” in a way that did not differentiate between employees of the judiciary and other (non-preference-eligible) excepted service employees. See 5 U.S.C. § 7511(a)(1988) (amended 1990) (defining “employee” for the purposes of Chapter 75, Subchapter II, as a non-probationary member of the competitive service or as certain preference eligible members of the civil service); Fausto, 484 U.S. at 447, 108 S.Ct. 668 (“The definition of ‘employee[s]’ covered by Subchapter II (major adverse action) specifically includes preference eligibles in the excepted service, § 7511(a)(1)(B), but does not include other members of the excepted service.”). Therefore, as a non-preference-eligible excepted service employee of an executive agency, Fausto was then, as Dotson is now, ineligible for any of the administrative or judicial review protections afforded by Chapter 75 for adverse employment actions.
Both before and after Fausto, in cases invoking Bivens and in cases relying on particular remedial statutes, federal circuit courts have drawn similar conclusions about the preclusive effect of the comprehensive remedial scheme established by the CSRA. Most recently, in Orsay v. United States Dep’t of Justice, 289 F.3d 1125 (9th Cir.2002), the Ninth Circuit ruled that deputy United States marshals could not sue under the Privacy Act, 5 U.S.C. § 552a(g)(1)(C), for alleged retaliatory discipline even though no relief was available to them under the CSRA. The Ninth Circuit had made the same point with respect to Social Security Administration employees almost a decade earlier in Saul v. United States, 928 F.2d 829 (9th Cir.1991). Noting that “the CSRA is a special factor counseling against recognition of a Bivens remedy,” Saul held that “the CSRA precludes even those Bivens claims for which the act prescribes no alternative remedy,” *168 id. at 840. The Eleventh Circuit cited Saul in holding that the CSRA precludes a Bivens claim virtually identical to the one presented by Dotson: a federal probation officer suing his superiors for race discrimination in termination. See Lee v. Hughes, 145 F.3d at 1276. Indeed, no circuit court has ruled that a federal employee covered by the CSRA may pursue a Bivens damages action to challenge an adverse employment decision. See also Lombardi v. Small Bus. Admin., 889 F.2d 959, 961 (10th Cir.1989) (citing Fausto and Chilicky to support holding that no Bivens action is available in a federal employment dispute “even if no remedy at all has been provided by the CSRA”); Feit v. Ward, 886 F.2d 848, 854-56 (7th Cir.1989) (holding that comprehensiveness of CSRA’s administrative system, together with Congress’s authority regarding federal employment, constitute special factors precluding Bivens challenge to adverse employment action); Volk v. Hobson, 866 F.2d 1398, 1403 (Fed.Cir.1989) (observing that. “[w]hether or not an employee has access to all of the procedures and remedies of the CSRA,” courts should not recognize Bivens actions “to fill perceived gaps in the [statutory] program”); Spagnola v. Mathis, 859 F.2d 223, 228-29 (D.C.Cir.1988) (per curiam)(en banc) (identifying the comprehensive review system established by the CSRA, Congress’s “advertent” omission of damages relief for certain CSRA claims, and the absence of any clear expression of congressional intent to preserve Bivens remedies, as “special factors” precluding the creation of a Bivens damages -action for constitutional challenges to federal personnel-actions); Pinar v. Dole, 747 F.2d 899, 910-12 (4th Cir.1984) (noting that Congress intended CSRA remedies to be exclusive and rejecting federal employee’s Bivens challenge to personnel actions taken against him); Braun v. United States, 707 F.2d 922, 926 (6th Cir.1983) (holding that federal employee could not pursue Bivens action for retaliation in employment); Broadway v. Block, 694 F.2d 979, 985 (5th Cir.1982) (holding that federal employee who challenged reassignment could not bring a Bivens action); cf. Zimbelman v. Savage, 228 F.3d 367, 370-71 (4th Cir.2000) (holding that civilian Air Force employees excluded from the CSRA by Congress in order to give the armed services maximum personnel flexibility could not use Bivens action to challenge dismissal).
While our own court has not specifically ruled on the preclusive effect of the CSRA on Bivens actions, we implicitly approved such preclusion in Dew v. United States, 192 F.3d 366 (2d Cir.1999). In that case, we ruled that the Uniformed Services Employment and Reemployment Rights Act (“USERRA”), 38 U.S.C. § 4301 et seq., precluded a judicial challenge to an employment policy prohibiting Federal Bureau of Investigation agents from serving as Ready Reserves in military reserve units, even though USERRA provided no alternative mechanism for review.. See Dew v. United States, 192 F.3d at 372-73. In reaching this conclusion, we analogized USERRA to the CSRA, and explained that the CSRA precludes Bivens challenges to employment actions, even where alternative remedies are unavailable .to the employee. See id. (and cases cited therein).
We now expressly hold what we implied in dictum in Dew: the remedial scheme established by the CSRA precludes federal civil service employees from challenging adverse employment decisions through Bivens actions for money damages.
3. CSRA Preclusion of Bivens Actions Applies to Judicial Branch Employees
(a) Rulings in Other Circuits
In applying CSRA preclusion to Dotson’s case, we recognize that because he is *169 a non-preference eligible exempt employee of the judicial branch, the CSRA not only affords him no damages remedy for the alleged constitutional violations in the termination of his employment; it provides him with no administrative or judicial review of the challenged employment action. We note, however, that when Fausto was decided no non-preference-eligible members of the excepted service were entitled to any administrative or judicial review for challenged employment actions under Chapter 75; thus, Dotson is no worse off now than the plaintiff in Fausto was at that time.
In Lee v. Hughes, 145 F.3d at 1275, the Eleventh Circuit confronted a case, like this one, in which a probation officer sought to challenge an adverse employment action. That court concluded, despite the unavailability of any other protections under the CSRA, that Bush, Chüicky, and Fausto warranted preclusion of the Bivens claim. The court explained:
[T]he exclusion of certain classes of employees from the remedies provided by the CSRA reflects not congressional silence from which courts may imply that an excluded employee is “free to pursue whatever judicial remedies he would have had before enactment of the CSRA,” ... but rather congressional intent to deny the excluded employee specific protections otherwise afforded by the Act.... In light of Congress’s deliberate exclusion of certain employees from the protections of the CSRA and this country’s long-respected separation of powers doctrine, courts should be hesitant to provide an aggrieved plaintiff with a remedy where Congress intentionally has withheld one.
Lee v. Hughes, 145 F.3d at 1276 (quoting Fausto, 484 U.S. at 447, 108 S.Ct. 668)(in-ternal citations omitted).
The Ninth Circuit has similarly ruled that CSRA preclusion bars Bivens actions by employees of the judicial branch. See Blankenship v. McDonald, 176 F.3d 1192, 1195 (9th Cir.1999). In that case, a federal court reporter alleged that her termination violated due process because it was in retaliation for her testimony at a court EEO hearing. The Ninth Circuit acknowledged that the CSRA afforded the reporter “no effective remedies,” id. at 1194; nevertheless, because it concluded that Congress’s decision in this regard had not been inadvertent, it declined to recognize a Bivens cause of action, see id. at 1195.
We agree with the Ninth and Eleventh Circuits that Congress’s omission of review rights for judicial branch employees was not inadvertent and, therefore, precludes pursuit of a Bivens claim.[4] Indeed, Congress’s intent on this point can be discerned in three ways.
(b) Congress’s Withholding of CSRA Revieiv Rights from Judicial Branch Employees Was Not Inadvertent
(1) The Statutory Structure Belies Inadvertence
Congress’s intent to withhold CSRA review rights from judicial branch employees *170 is discernable in the first instance from the structure of the CSRA. Title 5 does not ignore judicial branch personnel in establishing laws relevant to the civil service. To the contrary, it specifically includes such personnel within the civil service and defines them as “employees” for various purposes. See 5 U.S.C. §§ 2101, 2105; see also Blankenship v. McDonald, 176 F.3d at 1195 (noting that in Title 5 “Congress has given judicial employees certain employment benefits and remedies, such as back pay, severance pay, family and medical leave, and health and retirement benefits”).[5] At the same time that Congress thus brought judicial branch employees within the CSRA scheme, however, it expressly excluded them, as members of the excepted service, from specific procedural rights and remedies. See 5 U.S.C. §§ 2302, 4301, 7511. Construing this exclusion of excepted service employees (including judicial branch employees) from the then-operative CSRA provisions granting review rights, the Supreme Court in Fausto concluded that Congress’s action was not inadvertent but deliberate:
The comprehensive nature of the CSRA, the attention that it gives throughout to the rights of nonpreference excepted service employees, and the fact that it does not include them in provisions for administrative and judicial review contained in Chapter 75, combine to establish a congressional judgment that those employees should not be able to demand judicial review for the type of personnel action covered by that chapter.
United States v. Fausto, 484 U.S. at 448, 108 S.Ct. 668; see also Blankenship v. McDonald, 176 F.3d at 1195; Lee v. Hughes, 145 F.3d at 1276.
(2) The Amendment History of the CSRA Evidences Congress’s Deliberate Decision to Exclude Judicial Branch Employees from the Statute’s Review Procedures
The applicability of Fausto’s conclusion to judicial branch employees is reinforced by the second factor evidencing congressional intent: the fact that on two occasions when Congress amended CSRA review provisions pertaining to excepted service employees, it did not extend these procedural protections to judicial branch personnel.
The first amendment was in response to Fausto’s holding that non-preference eligible excepted service employees who lacked review rights under the CSRA were nevertheless precluded from bringing damages actions. Congress modified the Act to extend review rights to certain non-preference eligible excepted service employees. See Civil Service Due Process Amendments of 1990, Pub.L. No. 101-376, 104 Stat. 461 (Aug. 17, 1990) (codified in relevant part at 5 U.S.C. § 7511(a)(1)(C)); H.R.Rep. No. 101-328 (1989), reprinted in 1990 U.S.Code Cong. & Admin. News 695, 698 (citing Fausto as impetus for the *171 amendment). Significantly, as our earlier discussion of § 7511(a)(1)(C) indicates, see supra at 164-65, judiciary employees were not among those to whom the extension applied. See Hartman v. Merit Sys. Prot. Bd., 77 F.3d at 1379-81.
Even more telling was Congress’s amendment of the CSRA the following year in the Administrative Office of the United States Courts Personnel Act of 1990 (“AOUSC Act”), Pub.L. No. 101-474, § 5, 104 Stat. 1097, 1099-1100 (Oct. 30, 1990). The AOUSC Act, inter alia, eliminated a loophole in the statutory scheme that had granted CSRA review rights to certain judicial employees in the AOUSC that were unavailable to all other judicial employees.[6] The AOUSC Act sought to bring AOUSC employees in line with the remainder of judicial branch personnel. This was accomplished, however, not by extending CSRA review rights to judiciary employees generally, but by phasing out such rights for AOUSC employees. See generally H.R.Rep. No. 101-770(1), reprinted in 1990 U.S.Code Cong. & Admin. News 1709, 1710 (the purpose of the AOUSC Act is to authorize a personnel system within AOUSC that is “free from executive branch controls and more similar to that of the rest of the judicial branch” because keeping AOUSC employees subject to the executive branch is “contrary to the doctrine of separation of powers”).[7] Congress’s decision to eliminate CSRA procedural protections for the small class of judicial branch employees to whom they had long applied indisputably reveals its conscious decision to withhold such statutory review rights from judicial employees generally.
(3) The Judiciary’s Own Administrative Review Procedures for Employment Disputes Provide a Rational Basis for Congress’s Decision to Withhold Statutory Remedies
Dotson and amicus submit that Congress could not have intended to grant extensive administrative and judicial review rights to most civil service employees while withholding such procedural protections from judicial branch employees. Indeed, amicus argues that such a distinction would be irrational and a violation of equal protection. A third factor, however, explains the rationality of Congress’s choice: the judiciary’s own comprehensive procedures for review of adverse employment actions. Like the CSRA, the judiciary’s review procedures have been modified and refined over the years better to balance *172 the dual concerns for fair treatment of employees and efficient judicial administration. But one factor particularly relevant to this case has informed the process for almost forty years: the commitment to equal employment opportunity.
Since 1966, it has been the avowed policy of the federal judiciary, speaking through the Judicial Conference of the United States, “to follow the equal employment opportunity principles applicable to private sector and government employers.” Rep. of the Jud. Conf. of the United States, “Study of Judicial Branch Coverage Pursuant to the Congressional Accountability Act of 1995,” at 6 (December 1996), (detailing history of judiciary commitment to equal employment opportunity) (hereinafter “CAA Study”).[8] Thus, soon after Congress’s enactment of the CSRA, the Judicial Conference developed a Model Equal Employment Opportunity Plan and, by resolution, required federal courts to adopt EEO plans “in conformance with the national policy of providing equal employment opportunity to all persons regardless of their race, sex, color, national origin, religion, age ... or handicap.” Rep. of the Jud. Conf. of the United States, Judiciary Equal Employment Opportunity Program — -Model Equal Employment Opportunity Plan § I (1980, rev.1986) (“Model Plan”), available at http://www.usc-ourts.gov/forms/A0342.pdf. The Model Plan requires each federal court to “promote equal employment opportunity through a program encompassing all facets of personnel management including recruitment, hiring, promotion and advancement.” Id.
The scope of the Model Plan endorsed by the Judicial Conference and subsequently adopted by each federal court is expansive, affording “all court personnel including judges’ staffs and court officers and their staffs,” id. § II, and “[a]U applicants for court positions” the right to “seek timely redress of discrimination complaints,” id. App. 1, § I. Further, all persons filing discrimination complaints have the right “to be free from retaliation, coercion, or interference because of filing a timely complaint.” Id. App. 1, § III.A. They have the right in pursuing their complaint to be represented by a person of their choice, see id. App. 1, § III.B., the right to have “reasonable notice of any hearing conducted on a complaint,” id. App. 1, § III.C., and the right to “use a reasonable amount of official time to prepare their case,” id. App. 1, § III.D.
A complainant initiates the administrative review process outlined in the Model Plan by filing a written complaint with a court’s designated EEO Coordinator within fifteen days of the alleged incident. See id. App. 1,' § IV. A, D. 1.[9] The EEO Coordinator is charged with the responsibility to investigate the matter, “consult with the involved parties and seek an informal resolution,” and “prepare a report to the parties identifying the issues, describing his or her findings and recommendations, explaining what resolution, if any, was achieved, and defining what corrective actions, if any, will be undertaken.” Id. App. 1, § IV.B.
If either party is dissatisfied with the findings and recommendations of the EEO Coordinator, the Model Plan affords further review upon filing of “a written request with the Chief Judge or a designee to have the matter reviewed.” Id. App. 1, § IV. C. 1. Upon receipt of such a request, the Chief Judge or a designee will conduct any necessary investigation, determine *173 whether to interview the parties or other witnesses, determine whether to hold a hearing on the matter, and issue a final decision on the complaint. See id. App. 1, § IV. C. 2. If the Chief Judge deems a hearing necessary, all parties are timely notified and have the right to be represented at the hearing, to present evidence, and to cross-examine witnesses. Id. App. 1, § IV. C. 3.
Congress’s awareness of the courts’ EEO plans is beyond question. Indeed, it has carefully monitored the operation of these plans to satisfy itself that they adequately protect judicial employees from discrimination without the need for legislative action. This oversight role was most evident in conjunction with the enactment of the Congressional Accountability Act of 1995 (“CAA”), whereby Congress extended to its own employees the protections of eleven labor laws generally applicable to other public and private employees, including the protections against discrimination provided in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. See 2 U.S.C. § 1302, et seq. (West 1995).[10]
In enacting the CAA, Congress initially considered extending the statute’s coverage to employees of the judicial branch but, mindful of the importance of judicial autonomy, ultimately decided against such action.[11] Instead, Congress required the Judicial Conference to prepare a report “on the application to the judicial branch” of the labor laws in question, including “any recommendations the Judicial Conference may have for legislation to provide to employees of the judicial branch the rights, protections, and procedures under the [labor] laws, including administrative and judicial relief, that are comparable to those available to employees of the legislative branch under [the CAA].” 2 U.S.C. § 1434; see also 141 Cong. Rec. S439, S442 (Jan. 5, 1995) (comments of Sen. Charles Grassley) (noting that the provision directing the Judicial Conference to undertake a study “to determine how employees of the judiciary will obtain the rights and remedies conferred by these *174 [labor] laws” was included in the CAA “to ensure compliance with these laws by the judicial branch”).
In December of 1996, the Judicial Conference submitted to Congress a “Study of Judicial Branch Coverage Pursuant to the Congressional Accountability Act of 1995.” See Rep. of the Jud. Conf. of the United States (Mar. 11, 1997), available at http://www.uscourts.gov/judconb' jecrpt397.html. After an exhaustive survey of then-operative judicial procedures, the Judicial Conference reported that “[t]he judiciary currently provides its employees with protections similar to those enumerated in the laws referenced in the CAA.” See CAA Study at 2.[12] Nevertheless, mindful of the new remedial scheme established in the CAA for congressional employees, the Conference proposed to review and revise its Model EEO Plan to afford judicial employees review procedures similar to those adopted by Congress in establishing its internal Office of Compliance. See id. at 7. The Conference concluded that in light of both this proposal and the judiciary’s history of administrative review, no legislative action was neces *175 sary to ensure the rights of judicial branch employees:
Overall, in light of current judicial branch policies and enhancements undertaken in the course of the judiciary’s CAA study process, the Judicial Conference concludes that legislation is neither necessary nor advisable in order to provide judicial branch employees with protections comparable to those provided to legislative branch employees under the CAA.
Id. at 2.
In support of this conclusion, the Conference highlighted the importance of internal governance to the principle of judicial independence. “From the beginning of the federal court system, the hallmarks of judicial branch governance have been local court management and individual judge autonomy, coupled with mechanisms for ensuring accountability and effective use of resources.” Id. at 4. For this reason, the “judiciary’s internal governance system is a necessary corollary to judicial independence.” Id.
Significantly, after receipt of the CAA Study, Congress took no action to legislate administrative or judicial review requirements for the judicial branch. Instead, over the course of the next year, the Judicial Conference devised a new Model Employment Dispute Resolution Plan (“Model EDR Plan”) to provide employees with “an enhanced administrative dispute resolution process similar to the structure Congress has created in the Office of Compliance.” Jud. Conf. of the United States,- Model EDR Plan (Mar.1997), available at http: //www.ee9.uscourts.gov/Web/OCELibra. nsfy'0/f75b8f4776df874e8825650e0065ef2c? OpenDócument The Model EDR Plan is, in fact, an adjunct to the Conference’s earlier Model EEO Plan, which it leaves intact except for the complaint procedures outlined in Appendix A to the Model EEO Plan.[13]
Drawing on the CAA, the Model EDR Plan establishes mandatory counseling and mediation as initial first steps in the dispute resolution process. Id. Ch. VIII, §§ 1, 5C.2, 6B.8. Within fifteen days after notice of the end of the mediation period, an employee who still thinks himself aggrieved may file a formal written complaint. See id. Ch. VIII, § 7A. Upon determination that the complaint states a claim for relief and raises a material dispute of fact, the court’s chief judge, or another designated judicial officer, must hold a heading on the merits within sixty days of the filing of the complaint. See id. Ch. VIII, §§ 7B.2, 7C.1, 7C.2.a. The judicial officer enjoys broad discretion to provide “such discovery and investigation as is necessary.” Id. Ch. VIII, § 7C.2. The employee, however, has the right to be notified of the date of the hearing, to be represented, to present evidence, and to cross-examine witnesses. See id. Ch. VIII, § 7C.2.b., c. The hearing must be recorded, see. id. Ch. VIII, § 7C.2.d, and any final decision made available to the public, see id. at Ch. VIII, § 10. Should the judicial officer conclude that a right protected by the plan has been violated, he may award broad equitable relief and, “where the statutory criteria of the Back Pay Act” are satisfied, a monetary award. See id. Ch. VIII, §§ 9A-C.
*176 The Model EDR Plan also provides for an additional level of appellate review not available under the original EEO Model Plan. Specifically, an employee dissatisfied with the final hearing decision “may petition for review of that decision under procedures established by the judicial council of the circuit.” Id. Ch. VIII, § 8. The Second Circuit’s EDR Plan, based on the Judicial Conference’s model, provides for such petition to be made in writing to the Circuit Executive. Review is conducted by one or more members of the Circuit Judicial Council “as designated by the Chief Circuit Judge.” See Equal Opportunity and Employment' Dispute Resolution Plan of the Second Circuit Court of Appeals (effective Sept. 1, 2003) Ch. IV., § 3(e) 5.
We so painstakingly detail the history of administrative review of adverse émployment actions within the judiciary to make several points supporting the conclusion that Congress’s decision to withhold CSRA review procedures from judicial employees was deliberate and rational: (1) adminisr trative review within the judiciary plainly has a long history, which has been well known to Congress; (2) at all times pertinent to this action, a judicial employee who thought himself the victim of unlawful discrimination had specific procedures available to him (separate and apart from the disciplinary review pursued by Dotson) to raise such a claim; (3) such internal procedures have always involved some opportunity for review by a judicial officer;[14] and (4) within the last decade, Congress has engaged in an extensive dialogue with the federal courts about the need to legislate remedies for judicial employment disputes, with Congress ultimately choosing not to enact any such legislation and with the courts establishing even more detailed and multi-layered levels of administrative review.
Under these circumstances, we conclude that Congress’s decision to exclude judicial branch employees from the administrative and judicial review procedures of the CSRA, and from subsequent legislation such as the CAA, was not inadvertent, but a conscious and rational choice made and maintained over the years in light of both a proper regard for judicial independence and recognition of the judiciary’s own comprehensive review procedures for adverse employment actions, including review by judicial officers.
For all these reasons, we conclude that judicial branch employees such as Dotson, no less than other federal employees covered by the CSRA, are precluded from pursuing Bivens damages actions for adverse employment decisions. The district court’s dismissal of Dotson’s Bivens claim is affirmed.
TV. Dotson’s Equitable Claims Are Also Precluded by the CSRA
In addition to suing for damages, Dotson seeks equitable relief, specifically, an order reinstating him to his former position as a probation officer. Defendants submit that such an equitable claim, no less than one for damages at law, is precluded by the CSRA. Alternatively, and with little discussion, they assert that an equitable claim for reinstatement is necessarily brought against defendants in their official capacity and, as such, is barred by sovereign immu *177 nity. Because a finding of sovereign immunity would deprive this court of subject matter jurisdiction, we address that question first, see Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94-96, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); accord Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 577, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999); Adeleke v. United States, 355 F.3d 144, 150 (2d Cir.2004); cf. Fama v. Commissioner of Correctional Services, 235 F.3d 804, 816 n. 11 (2d Cir.2000) (noting that the Supreme Court bar on the assumption of “hypothetical jurisdiction” pertains only to constitutional restrictions on jurisdiction, not statutory restrictions), and we conclude that Dotson’s claim for reinstatement is not so barred. Nevertheless, we conclude that his-equitable claim is precluded by the CSRA.
A. Sovereign Immunity
“ ‘The United States, as sovereign, is immune from suit save as it consents to be sued ..., and the terms of its consent to be sued in any court define that court’s jurisdiction to entertain the suit.’ ” United States v. Mitchell, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (quoting United States v. Sherwood, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)); accord Adeleke v. United States, 355 F.3d at 150.[15] The shield of sovereign immunity protects not only the United States but also its agencies and officers when the latter act in their official capacities. See FDIC v. Meyer, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994).
In Larson v. Domestic & Foreign Commerce Corp., the Supreme Court recognized two exceptions to these principles of sovereign immunity: The Court stated:
the action of an officer of the sovereign (be it holding, taking or otherwise -legally affecting the plaintiffs property) can be regarded as so ‘illegal’ as to permit a suit for a specific relief against the officer as an individual only [1] if it is not within the officer’s statutory powers or, [2] if within those powers, only if the powers, or their exercise in the particular case, are constitutionally void.
337 U.S. 682, 701-02, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). Dotson’s constitutional challenge to defendants’ termination action appears to fall squarely within the second Larson exception. In a footnote, however, Larson appears to have qualified this exception, stating:
Of course, a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested can not be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property.
Id. at 691 n. 11, 69 S.Ct. 1457. To the extent affirmative action by the United States would be required to reinstate Dotson to his former position as a probation officer and expenditure of its monies would be required to pay .his salary, the Larson footnote raises a question as to whether we can entertain his equitable claim.[16]
*178 Subsequent decisions by the Supreme Court, this court, and our sister circuits all indicate that the answer to this question is yes. A court order of reinstatement, whether of government benefits or employment, is not barred by sovereign immunity. That conclusion finds support in Edelman v. Jordan, in which the Supreme Court drew an important distinction between claims against government officials seeking “retroactive award[s]” of equitable restitution and those seeking “prospective” decrees compelling the defendants to conform their official conduct to a legal mandate. 415 U.S. 651, 668, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The Court concluded that retrospective relief was “in practical effect indistinguishable ... from an award of damages against the State” and, thus, barred by the Eleventh Amendment. Id. But no such analogy and, therefore, no such bar applied to prospective decrees even though “the necessary result of compliance” was “an ancillary effect on the state treasury.” Id. Applying these principles to the Edelman plaintiffs, the Court ruled that their claim to recover withheld welfare benefits operated retrospectively and was, therefore, barred by sovereign immunity, but their request for an order reinstating them to the state’s welfare rolls operated prospectively and, thus, was not barred. See id.
Relying on Edelman, this court in Dwyer v. Regan, concluded that a state employee’s constitutional challenge to his termination, see 42 U.S.C. § 1983, was barred by the Eleventh Amendment to the extent he sought a retroactive award of backpay. See Dwyer v. Regan, 777 F.2d 825, 836 (2d Cir.1986). But his equitable claim for reinstatement was not so barred, because “[rjeinstatement is purely prospective injunctive relief that orders the state official to return the former employee to the state’s payroll.” Id. The fact that such an order might subsequently require the expenditure of state funds to pay the reinstated employee’s salary “is ancillary to such a prospective injunction” and, thus not barred. Id.[17]
*179 A number of our sister circuits have rejected similar jurisdictional challenges to reinstatement claims, regardless of whether the plaintiffs former employer had been the federal government or that of a state.[18] See Meiners v. Univ. of Kansas, 359 F.3d 1222, 1232-33 (10th Cir.2004) (holding that reinstatement claim is not barred by Eleventh Amendment); Doe v. Lawrence Livermore Nat. Lab., 131 F.3d 836, 839-41 (9th Cir.1997) (same); Swan v. Clinton, 100 F.3d 973, 981 (D.C.Cir.1996) (holding that reinstatement claim is not barred by federal sovereign immunity); Williams v. Kentucky, 24 F.3d 1526, 1544 (6th Cir.1994) (holding that reinstatement claim was not barred by Eleventh Amendment); Elliott v. Hinds, 786 F.2d 298, 302 (7th Cir.1986) (same); see also Van Drasek v. Lehman, 762 F.2d 1065, 1069 n. 3 (D.C.Cir.1985) (noting that “even before section 702 [of the Tucker Act] was amended to explicitly waive sovereign immunity for non-monetary claims against the United States, sovereign immunity was no bar to federal employees seeking reinstatement from an unlawful discharge”).
In their terse invocation of sovereign immunity, defendants fail to cite, much less to distinguish, Edelman, Dwyer, or any of the cited reinstatement cases from other circuits. Because defendants provide us with no argument for departing from our prior holding in Dwyer, which, in any event, binds us unless and until reversed by the. Supreme Court or by this court sitting en banc, see Gelman v. Ashcroft, 372 F.3d 495, 499 (2d Cir.2004), we conclude that Dotson’s claim for equitable reinstatement is not barred by sovereign immunity.
B. Dotson’s Equitable Claims Are Precluded by the CSRA
The circuits are divided as to whether equitable relief such as reinstatement is available to federal employees notwithstanding their general agreement that the CSRA precludes Bivens claims for damages. The First, Fourth, Ninth, Tenth, and Eleventh Circuits have concluded from the, comprehensive nature of the CSRA that Congress did not intend for federal employees to pursue supplemental judicial relief, even in equity, for classic employment disputes.. See Saul v. United States, 928 F.2d.at 843 [9th Cir.] Stephens v. Dep’t of Health & Human Servs., 901 F.2d 1571, 1575-77 (11th Cir.1990); Lombardi v. Small Bus. Admin., 889 F.2d at 961-62 [10th Cir.]; Berrios v. Dep’t of the Army, 884 F.2d 28, 31 (1st Cir.1989); Pinar v. Dole, 747 F.2d at 910-12 [4th Cir.]; Hallock v. Moses, 731 F.2d 754, 757 (11th Cir.1984). The Third and D.C. Circuits, however, have reached the opposite conclusion. , See Mitchum v. Hurt, 73 F.3d 30, 35-36 (3d Cir.1996); Hubbard v. EPA, 809 *180 F.2d 1, 11 (D.C.Cir.1986); see also Spagnola v. Mathis, 859 F.2d at 229-30 [D.C.Cir.] (reaffirming Hubbard). These courts reason that the “ ‘presumed availability of federal equitable relief against threatened invasions of constitutional interests’ ” makes preclusion inappropriate absent a clear expression of congressional intent. Mitchum v. Hurt, 73 F.3d at 35-36 (quoting Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. at 404, 91 S.Ct. 1999 (Harlan, J., concurring)). They conclude that the CSRA does not express such an intent with sufficient strength and clarity to bar courts’ traditional power to do equity. Hubbard v. EPA, 809 F.2d at 11 n. 15; Mitchum v. Hurt, 73 F.3d at 35 (“Just because ‘special factors counseling hesitation’ militate against the creation of a new non-statutory damages remedy, it does not necessarily follow that the long-recognized availability of injunctive relief should be restricted as well.”)
This court was presented with the question of whether the CSRA precludes a separate equitable challenge to a federal employment action in Tiltti v. Weise, 155 F.3d 596 (2d Cir.1998). Although we found it unnecessary to resolve the issue in that case, we did acknowledge the majority view favoring preclusion of supplemental equitable relief. See id. at 602 (and cases cited therein). In now confronting the question again, we begin by noting, as the Third Circuit has, that sound arguments can be mustered both in favor of and against preclusion of a federal employee’s equitable challenge to employment discrimination. See Mitchum v. Hurt, 73 F.3d at 34 (acknowledging that “a good argument can be made that a federal employee who has meaningful administrative remedies and a right to judicial review under the CSRA or another comparable statutory scheme should not be permitted to bypass that scheme by bringing an action under 28 U.S.C. § 1331,” though ruling to the contrary). Nevertheless, because we conclude that the majority view is more convincing, we today align ourselves with those circuits that have held that employees covered by the CSRA— including judicial branch employees — may not sue in equity for reinstatement of employment, even when they present constitutional challenges to their termination.
Congress’s power to restrict the availability of equitable relief cannot be disputed. See, e.g., 28 U.S.C. §§ 1341, 2283; 26 U.S.C. § 7421(a). While courts proceed cautiously when considering whether “Congress has impliedly imposed such a restriction on the authority to award injunctive relief to vindicate constitutional rights,” Mitchum v. Hurt, 73 F.3d at 35, we conclude that Congress’s intent in fashioning the CSRA is clear: federal employees may seek court review for employment actions “as provided in the CSRA or not at all.” Veit v. Heckler, 746 F.2d 508, 511 (9th Cir.1984) (emphasis added).
As discussed supra at 169-76, the structure of the CSRA, its amendment history, and circumstances relating to the enactment of the CAA all indicate that Congress deliberately decided to afford administrative and judicial review to judicial branch employees “not at all.” Further, this withholding of review from judicial branch employees is not contingent upon whether the relief sought is monetary or equitable. In fact, both forms of relief are otherwise integral to the review mechanism established by the CSRA. See 5 U.S.C. § 1214(g)(stating that MSPB’s authorized corrective actions include, inter alia, “damages” and orders “that the individual be placed, as nearly as possible, in the position the individual would have been in had the prohibited personnel practice *181 not occurred”); Saul v. United States, 928 F.2d at 843 (noting that the CSRA provides its own form of injunctive relief); Black v. Dep’t of Justice, 85 M.S.P.R. 650, 654 (M.S.P.B.2000) (holding that MSPB has the authority to order reinstatement). The integration of equitable relief, including reinstatement, into the CSRA’s comprehensive statutory scheme evinces Congress’s intent to determine for itself the scope of that relief and to preclude its applicability to federal employment disputes except where provided by statute.
The Supreme Court’s admonitions in Bush v. Lucas and Schweiker v. Chilicky instruct courts not to disrupt the remedial balance struck by Congress in structuring a comprehensive statutory scheme such as the CSRA. See Bush v. Lucas, 462 U.S. at 389 (“Congress is in a far better position than a court to evaluate the impact of a new species of litigation between federal employees on the efficiency of the civil service.”); see also Schweiker v. Chilicky, 487 U.S. at 429, 108 S.Ct. 2460 (“Whether or not we believe that its response was the best response, Congress is the body charged with making the inevitable compromises required in the design of a massive and complex [statutory scheme] ... and we see no legal basis that would allow us to revise its decision.”); Hallock v. Moses, 731 F.2d at 757 (“Congress is in a better position to decide whether the public interest would be served by fashioning the judicial remedy urged by [plaintiff].”).
Precisely because Supreme Court precedent thus “virtually prohibit[s] intrusion by the Courts into the statutory scheme established by Congress [in the CSRA],” the Tenth Circuit has concluded that intrusion is “disfavored whether it is accomplished by the creation of a damages remedy or injunctive relief.” Lombardi v. Small Bus. Admin., 889 F.2d at 962; accord Saul v. United States, 928 F.2d at 843 (citing approvingly to language from Lombardi); see also Weatherford v. Dole, 763 F.2d 392, 394 (10th Cir.1985) (denying reinstatement to federal employee because “[c]ertain agency personnel decisions are simply not subject to judicial review”). We agree.
Viewed in isolation, Congress’s decision to withhold judicial review from aggrieved judicial branch employees may seem curious. Congress, however, was well aware that its decision did not leave judicial branch employees without any relief for employment grievances. As detailed supra at 171-76, the judiciary has long afforded its employees administrative review of adverse employment decisions, modeling its procedures on those available to members of the executive and legislative branches. Further, among the remedies available through the judiciary’s administrative process is the precise equitable relief here at issue: reinstatement. See Model EDR Plan Ch. VIII, § 9B.3.
Congress has carefully monitored the judiciary’s administrative review procedures over a number of years to assess whether legislation was necessary adequately to protect employee rights. In this context, Congress’s decision not to act endorses the conclusion that it considered the judicial review available to judicial branch employees through the judiciary’s own review plans adequate and intended no supplemental judicial review either at law or in equity.
In so concluding, we note that allowing judicial branch employees to pursue equitable challenges to employment actions would, in fact, provide them with more protection than other civil servants, potentially threatening the remedial balance established by Congress in the CSRA. See generally Volk v. Hobson, 866 F.2d at 1402 (cautioning that judicial recognition of remedies beyond those specified in the CSRA would “disrupt the [administrative *182 review] system and judicially create classes of preferred employees that Congress intentionally placed in a nonpre-ferred position, thereby inverting the statutory scheme”). Moreover, precisely because the judiciary’s administrative review process itself affords an employee one or more levels of judicial review, it would be particularly incongruous to hold that an employee who failed to secure administrative relief from these judicial officers could then invoke equity to have his claim reviewed by a different set of judicial officers.[19] In any event, recognition of an equitable action for constitutionally premised employment challenges by judicial branch employees might well encourage employees to bypass administrative remedies in favor of direct judicial review, thereby depriving courts of the opportunity to resolve personnel problems through administrative channels. See generally Broadway v. Block, 694 F.2d at 986 (holding that federal employee could not pursue judicial review of grievance through the Administrative Procedures Act rather than through CSRA administrative process because that would “encourage aggrieved employees to bypass the statutory and administrative remedies in order to seek direct judicial relief and thereby deprive the Government of the opportunity to work out its personnel problems within the framework it has so painstakingly established”) (internal quotation marks omitted).
In sum, Congress (1) has plainly expressed its intent to create in the CSRA a comprehensive scheme addressing the employment rights of federal civil service personnel; (2) has created, as part of the CSRA, a detailed mechanism for administrative and judicial review and relief, including equitable remedies; (3) has, nevertheless, specifically withheld from judicial branch employees the full range of review and relief afforded by the CSRA; (4) has reiterated its intent to withhold such relief from judicial branch employees through various statutory amendment cycles; and (5) has withheld this relief mindful of the alternative review and relief afforded judicial branch employees by the judiciary itself through administrative procedures that largely mirror those of the CSRA and that, at one or more levels, afford judicial review. From these facts and circumstances, we conclude that Congress has clearly expressed its intent to preclude federal civil service personnel, including judicial employees, from attempting to supplement statutory remedies (and those afforded by the judiciary itself) with separate suits at equity raising constitutional challenges to adverse employment actions.

Conclusion

For the reasons stated, we conclude (1) that Dotson cannot sue defendants for discriminatory termination pursuant to 42 U.S.C. § 1981 because their challenged actions were taken under color of federal, not state, law; (2) that he cannot pursue a Bivens damages action against the individual defendants for denial of equal protection because such an action is precluded by the CSRA; and (3) that Dotson cannot sue defendants in equity for reinstatement based on a denial of equal protection because such an action is also precluded by the CSRA. As an employee of the judicial branch, Dotson’s right to seek review of and relief from any adverse employment *183 action was defined by the administrative grievance plans of the court where he was employed. The district court’s judgment of dismissal is AffiRmed.

. In any event, the judiciary cannot avoid ruling on questions of law simply because the result will affect the judicial branch. See generally Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 825, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986) (if a certain conflict of interest would disqualify every available judge, “rule of necessity” provides that no judge is disqualified); United States v. Will, 449 U.S. 200, 213-16, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980) (holding that the Court could properly decide a suit challenging various judicial compensation provisions in which all Article III judges had a financial interest, because under the common law rule of necessity, federal judges have a duty to hear and decide cases before them, even though they may have an interest in the outcome, if the cases cannot otherwise be heard); see also, e.g., Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 347-52, 20 L.Ed. 646 (1871) (adopting common law doctrine of absolute immunity for judges in the performance of their judicial functions).

. Although the district court characterized this proceeding as a hearing under an "Equal Employment Opportunity Plan,” the parties apparently agree that the proceeding was a disciplinary hearing conducted pursuant to a predecessor plan to the Probation Office’s Disciplinary and Adverse Action Policy and Procedures (effective Feb. 26, 1998).
To the extent Dotson charges defendants with race discrimination in his termination, he could have also requested a hearing pursuant to the Southern District's then-operative Equal Employment Opportunity Plan, the model for which was established by the United States Judicial Conference. See infra at 171-73, 175. Because Dotson failed to pursue such relief, he cannot complain that his termination was in violation of due process. Although a plaintiff is generally not required to exhaust administrative remedies before bringing a § 1983 suit, see Patsy v. Bd. of Regents, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), this rule does not apply to procedural due process challenges if the plaintiff failed to avail himself of the very administrative procedures he attacks as inadequate. See Narumanchi v. Bd. of Trs. of Conn. State Univ., 850 F.2d 70, 72 (2d Cir.1988) (affirming dismissal of procedural due process claim because tenured teacher failed to submit to his union's grievance procedures, as set forth in a collective bargaining agreement); Aronson v. Hall, 707 F.2d 693, 694 (2d Cir.1983) (affirming dismissal of procedural due process claim because “[h]aving chosen not to pursue available administrative review, [plaintiff] is hardly in a position to claim that such review denied him due process”).

. We note that, in any event, Chapter 23 does not provide for judicial review. Rather, ag- ' grieved employees "are given the right to file charges of prohibited personnel practices' with the Office of Special Counsel” of the Merit Systems Protection Board, "whose responsibility it is to investigate the charges and, where appropriate, to seek remedial action from the agency and the [Board].” United States v. Fausto, 484 U.S. at 446, 108 S.Ct. 668 (quoting 5 U.S.C. § 1206). Nowhere does Dotson allege that he ever requested an investigation by the Special Counsel. See 5 U.S.C. § 1214(a)(3) (stating that employee must request investigation from Special Counsel before seeking corrective action from the Board absent a specific statute, rule, or regulation providing right of direct appeal to the Board).

. Amicus notes that the Report of this court’s Task Force on Gender, Racial, and Ethnic Fairness in the Courts, see 1997 Ann. Surv. Am. L. 9 (1997), assumed that judicial employees would be able to "bring Bivens actions, alleging violations of their constitutional rights by a federal official acting under color of legal authority,” id. at 72. The Task Force made this observation in a single sentence of a lengthy report addressing a wide range of issues. The Report, understandably, did not discuss the CSRA or consider the effect of the Supreme Court’s decisions in Bush, Chilicky, or Fausto. Accordingly, we do not find the Task Force’s Bivens conclusion particularly helpful to our resolution of this appeal.

. For instance, the Back Pay Act covers employees of the Administrative Office of the United States Courts (the "AOUSC”), the Federal Judicial Center, and all district courts of the United States (including probation officers who are employed by the court), see 5 U.S.C. § 5596(a)(2); 28 U.S.C. § 610, as does the statute providing for severance pay, see 5 U.S.C. § 5595(a)(1)(E). The Family and Medical Leave Act also applies to judicial employees through its incorporation of 5 U.S.C. §§ 2104-2105 (defining "employee” as an individual appointed by a court and engaged in the performance of a federal function under the supervision of a court — a category that would include probation officers). The judicial branch's inclusion in § 2105 also entitles judicial employees to health and retirement benefits. See 5 U.S.C. §§ 8901(1), 8401(11)(C). Finally, a right to workers' compensation is provided to "civil officer[s] or employee[s] in any branch of the Government of the United States.” Id. § 8101(1)(A).

. This anomaly originated in the fact that the functions of the AOUSC had, at one time, been performed by competitive service employees of the Department of Justice. When the AOUSC was created in 1939, see Act of August 7, 1939, Pub.L. No. 76-299, 53 Stat. 1223, these Justice Department employees were transferred to the judicial branch, with their rights as members of the competitive service preserved, see id. § 3, 53 Stat. at 1225 ("Those employees of the Department of Justice engaged in the audit of accounts and vouchers referred to in section 304 of the Judiciary Code shall, as far as practicable, be transferred to the Administrative Office of the United States Courts.”); see also id. §§ 5-6, 53 Stat. at 1226 (transferring corresponding auditing and clerical powers from Department of Justice to AOUSC). Moreover, competitive service rights were also accorded to certain AOUSC employees hired after the 1939 Act took effect. See id. § 1, 53 Stat. at 1223 (codified as amended at 28 U.S.C. §§ 601-604 (1948)).

. The AOUSC Act did, however, provide a "grandfather clause” permitting current AOUSC personnel with competitive service classifications to retain their MSPB review rights. See AOUSC Act § 3(f); see also H.R.Rep. No. 101-770(1), reprinted in 1990 U.S.Code Cong. & Admin. News at 1711 ("It is the committee's intent that current AO[USC] employees keep the same appeals procedures already granted to them.”).

. This Study is available from the AOUSC.

. As previously noted, it appears that Dotson never filed an EEO complaint with respect to his termination.

. Congressional employees, like their counterparts in the judicial branch, qualify as members of the excepted service under the CSRA. Thus, absent a special statutory grant, legislative employees, like judicial employees, do not possess administrative or judicial review rights under the CSRA.
In addition to Title VII rights, the CAA extends to congressional employees protection under the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq., the Americans with Disabilities Act of 1990 (“ADA”), 42 U.S.C. § 12101 et seq., the Age Discrimination in Employment Act of 1967 (“ADEA”), 29 U.S.C. 621 et seq., the Family and Medical Leave Act of 1993 ("FMLA”), 29 U.S.C. § 2611 et seq., the Occupational Safety and Health Act of 1970 (“OSHA”), 29 U.S.C. § 651 et seq., Chapter 71 of Title 5 (related to federal service labor-management relations), the Employee Polygraph Protection Act of 1988 (“EPPA”), 29 U.S.C. § 2001 et seq., the Worker Adjustment and Retraining Notification Act (“WARN”), 29 U.SC. § 2101 et seq., the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., and Chapter 43 of Title 38 (relating to veterans' employment and reemployment). Significantly, unlike the CSRA, the CAA does not provide congressional employees with any remedy for the violation of constitutional rights.

. Similar concerns for legislative autonomy apparently informed Congress's decision to reject executive branch involvement in the enforcement of the CAA. Accordingly, Congress created its own Office of Compliance, "an independent, nonpartisan office within the Legislative Branch.” See generally Sen. Charles Grassley, Practicing What We Preach: A Legislative History of Congressional Accountability, 35 Harv. J. on Legis. 33, 46 (1998) (noting author’s preference for enforcement of CAA by executive branch agencies). The CAA does, however, provide for judicial review of statutory claims arising in the legislative branch, subject to certain exhaustion requirements. See 2 U.S.C. §§ 1407-1409.

. With respect to the four anti-discrimination statutes referenced in the CAA (Title VII, the ADEA, the ADA, and the Rehabilitation Act), the Judicial Conference noted that the judiciary's EEO policy, first adopted in 1966, and the EEO plans in effect in each court followed the spirit and intent of the four statutes and provided for dispute resolution procedures similar to those "administrative procedures available to federal employees in the executive branch.” See CAA Study at 6.
The Conference further noted that the judiciary was in substantial compliance with ADA and Rehabilitation Act requirements for affording persons with disabilities access to court facilities and proceedings. See id. at 7. Indeed, such compliance was reinforced by the fact that the General Services Administration ("GSA”) and the United States Postal Service ("USPS”), the two organizations statutorily empowered to manage the more than 700 federal court facilities nationwide, are themselves subject to the ADA and Rehabilitation Act. See id. at 8. Similarly, because the GSA and the USPS are subject to OSHA, any complaints relating to health and safety conditions in federal court facilities could be pursued through those agencies. See id. at 10-11.
With regard to personnel issues generally, the Conference cited the judiciary's Long Range Plan for the Federal Courts, which declares, as a matter of policy, that the judicial branch strives "to improve working conditions and arrangements for all court support personnel.” Jud. Conf. of the United States, Long Range Plan for the Federal Courts, Rec. 75 (Dec. 1995), available at http://www.uscourts.gov/lrp/. Further, judicial employees are specifically protected under USERRA and thus entitled to statutory paid military leave. See CAA Study at 11. Similarly, most judicial employees are expressly covered by the FMLA. See id. at 12. Although the WARN does not apply to judicial branch employees, and although the judiciary had not, at the time of the CAA Study, experienced staff reductions of a scope to trigger the requirements of that statute, the Judicial Conference proposed to revise its Model EEO Plan to provide comparable protections to judicial employees. See id. at 12. Similarly, although judicial employees were not subject to lie detector tests, the Judicial Conference proposed to affirm the principles of the EPPA in a revised Model EEO Plan. See id. at 12.
The Conference noted that the Federal Labor-Management Relations Statute ("FLMRS”), 5 U.S.C. §§ 7101-7135, did not apply to the judicial branch; nevertheless, the public interests served by that statute were addressed within the judiciary through various employee organizations such as the Federal Court Clerks Association and the National Conference of Bankruptcy Clerks, as well as an extensive network of advisory groups, subgroups, and task forces. See id. at 12-14. Finally, with respect to the Fair Labor Standards Act, the Conference emphasized the judiciary's full compliance with the minimum wage, equal pay, and child labor policies of that law. See id. at 14. It noted, however, that with court staffing levels then capped at 84% of measured resource needs, the judiciary’s compliance with the overtime provisions of the FLSA would require Congress to vote a substantial increase in the judiciary budget. See id. at 17.

. On November 24, 1997, the Board of Judges of the Southern District of New York adopted an EDR plan based on the Judicial Conference's model. See App. to Appellant’s Br. at 38-45 (effective Jan. 1, 1999). Although both parties refer to the prior EEO plan of the Southern District of New York, neither has submitted a copy of that plan as part of the record on appeal.

. Indeed the judiciary is unique among the branches of government in being able to provide for itself some review of its administrative employment decisions by a judicial officer. For other branches of government, judicial review of administrative employment decisions requires legislation. Congress undoubtedly considered this fact and the long history of judicial review within the courts' EEO plans in concluding that it was unnecessary to legislate multiple and redundant levels of judicial review for court employees.

. As defendants correctly observe, Dotson may not take advantage of the United States's broad waiver of sovereign immunity in the Administrative Procedure Act, see 5 U.S.C. § 702, because that waiver applies only to "agencies,” and the federal judiciary is not an agency within the meaning of the act, see 5 U.S.C. § 701(b)(1)(B) (excluding "the courts of the United States” from the definition of statutory definition of agency); see also Richard H. Fallon, Jr., Daniel J. Meltzer, & David L. Shapiro, Hart & Wechsler’s The Federal Courts and The Federal System 969 (5th ed.2003).

. As Judge Friendly observed in Knight v. New York, the Larson footnote has been sub *178 jected to “microscopic scholarly scrutiny.’’ 443 F.2d 415, 420 (2d Cir.1971). Notably, Professor Louis L. Jaffe, seizing on the footnote's use of the phrase “may fail,” has stated that if "may is read as may and not as must, it is unobjectionable.” L. Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv. L.Rev. 1, 34 (1963). But, “if a decree which requires 'affirmative action by the sovereign,’ e.g., grant of a license, of a civil service post or any other of the actions traditionally enforced by mandamus, if such a decree could no longer be made, then Larson would have worked a sharp and startling change .... There is nothing whatever in the opinion to indicate an intention to override such well-established doctrines, let alone any reason to do so.” Id. A number of courts agreed and interpreted the Larson footnote narrowly to preclude only those suits where the affirmative equitable relief sought would impose an “intolerable burden on governmental functions.” Clark v. United States, 691 F.2d 837, 840 (7th Cir.1982); Washington v. Udall, 417 F.2d 1310, 1317-18 (9th Cir.1969); Saine v. Hospital Auth., 502 F.2d 1033, 1037 (5th Cir.1974). This court, however, was not among them. In Knight v. New York, a case arising under the Eleventh Amendment, we stated that, absent further guidance by the Supreme Court, Larson precluded a federal court from ordering affirmative action by either the state or federal government employees in their official capacities. 443 F.2d at 420-21; cf. Berk v. Laird, 429 F.2d 302, 306 (2d Cir.1970) (holding that sovereign immunity was not a bar to plaintiff’s action against federal authorities charged with exceeding their authority because the relief requested did not require affirmative government action). As discussed, infra, however, subsequent guidance provided by the Supreme Court in Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), indicates that no bar prevents a federal court from granting equitable relief in the form of an order directing government officials to reinstate either benefits or employment.

. This court cited approvingly to Dwyer in Russell v. Dunston, a case in which we ruled *179 "that an order reinstating [state employee] Russell to medical leave for purposes of his applying for disability retirement is prospective relief permitted by the Eleventh Amendment." 896 F.2d 664, 665 (2d Cir.1990). In rejecting the defense argument that such an order might require payments from the state treasury, we noted that the type of reinstatement Dwyer found permissible would have "directly entitled the plaintiff to a salary and thus had a far more certain and immediate effect on the state treasury than would result from allowing Russell merely to apply for disability retirement.” Id. at 668.

. We note that courts frequently draw parallels between principles of federal sovereign immunity and the Eleventh Amendment, see Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 111 n. 21, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); Larson v. Domestic & Foreign Commerce Corp., 337 U.S. at 691, 69 S.Ct. 1457; Connecticut v. Cahill, 217 F.3d 93, 101 (2d Cir.2000), and we are not inclined to look for distinctions in this case when no party has provided us with an argument for doing so.

. To the extent Dotson did not have the full range of judicial administrative review that we here outline, we note, as we have before, that this was the result of his apparent failure to file an EEO complaint. The availability of this process to address claims of employment discrimination is nevertheless relevant to our consideration of whether an equitable action for employment discrimination may be pursued by a judicial branch employee.